IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Lewis T. Babcock

Civil Action No. 06-cv-00997-LTB-MJW

BETTY CLARK-WINE,

      Plaintiff,

v.

THE CITY OF COLORADO SPRINGS,
LORNE KRAMER, Individually and in His Official Capacity, and
DAVID NICKERSON, Individually and in His Official Capacity,

      Defendants.

---

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

      This matter is before me on defendants' motion for summary judgment filed
November 3, 2006 (Dkt. #25), which was accompanied by a supporting brief and
documents marked as Exhibits A through D (Dkt. # 26). On November 24, 2006,
plaintiff filed a response to defendants' motion stating, pursuant to F.R.Civ.P. 56(f), that
she needed additional time to take discovery to fully respond to the defendants' motion
as to her First Amendment claims (Dkt. # 32). Plaintiff was granted additional time
through February 12, 2007 to file a further response (Dkt. # 40). On February 12,
2007, plaintiff filed her supplemental memorandum together with Exhibits 1 through 20
attached thereto (Dkt. # 42) ("Supplemental Response"). Defendants filed their reply
brief on March 5, 2007, together with Exhibits A through F (Dkt. # 46). On April 17,
2007, the Final Pretrial Order was approved by the Magistrate Judge (Dkt. # 50).

The motion is fully briefed and oral argument will not materially assist in its determination. For the reasons set forth below, I grant the motion.

## I. BACKGROUND

On December 27, 2005, Plaintiff Betty Clark-Wine was terminated from her position of employment as manager of the Real Estate Services Division ("RES") for the City of Colorado Springs ("City"), a position she had held since June 6, 2004. According to the job description pursuant to which plaintiff was hired, the position she held was an "at-will management position" requiring the employee to manage the City's Real Estate Services Division "which delivers real property services for City projects and programs, including real estate acquisition; relocation assistance to displaced families and businesses; sales of surplus properties; protection of real estate assets; and maintenance of property records." Exhibit A to Defendants' Motion.

Plaintiff's complaint, filed May 24, 2006, identifies a series of written and oral communications between herself and various City officials during the period between June 2004 and December 2005 in which she raises questions about the legality, propriety or procedural compliance of various real estate transactions undertaken or being considered by City agencies (Complaint, ¶¶ 10-23). Plaintiff alleges that she was terminated by Defendants Nickerson and Kramer, the deputy City Manager and City Manger of Colorado Springs, respectively, in retaliation for her "disclosing the waste of public funds, abuse of authority, or mismanagement of the City." (*Id.*, ¶¶ 24-26). Plaintiff's complaint alleges three claims for relief. First, she claims that her termination by the City violated her First Amendment right to "make expressions

relating to matters of public concern," including "issues of government corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees" which she avers were "matters of political, social, and other concern to the community." (*Id.*, ¶¶ 32-33).   Second, plaintiff alleges that her termination for making the disclosures of information referenced in the complaint violates the Colorado State Employee Protection Act (Whistleblower Act), C.R.S. § 24-50.5-101, *et seq.*  As a third claim, wholly dependent on her first, plaintiff seeks declaratory relief that her First Amendment rights were violated, and prospective injunctive relief against future violations.  She also seeks compensatory damages, back pay, front pay in lieu of reinstatement, and punitive damages.

## II.    DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

Substantial discovery having been taken by both sides of this controversy, defendants move for summary judgment as to plaintiff's claims.  Defendants contend that plaintiff's First Amendment claims are subject to summary judgment because all the expressions and statements which she claims gave rise to her termination were made during the course and scope of her employment.  Therefore, defendants submit, the Supreme Court's decision in *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006), issued four days after plaintiff's complaint was filed, precludes plaintiff's First Amendment claims here (Defendants' Brief at 3-6).  Defendants further argue that the protections of the Colorado Whistleblower Act are not available to plaintiff because she was not a state employee, and as an employee of  a home rule city the state statute does not apply to her (*id.* at 7-9).

Plaintiff responds that whether or not her various statements and expressions, which she claims led to her termination, were made in the course and scope of her employment, on the one hand, or in her capacity as a "concerned citizen" on the other hand, a differentiation recognized in *Garcetti*, is a matter of disputed fact precluding summary judgment (Supplemental Response at 4-15). She further argues that the protections of the Colorado Whistleblower Act extend to her as an employee of a home rule city (Plaintiff's Response at 2-5).

## III. STANDARD OF REVIEW

The purpose of summary judgment is to determine whether a trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate under F.R.Civ.P. 56(c) only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When applying this standard, the Court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party. *Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 613 (10th Cir. 1988). To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). In addition, "where the non-moving party will bear the burden of proof at trial on a dispositive issue that party must 'go beyond the pleadings' and

'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir. 1998) (citation omitted).

## IV.    ANALYSIS

### A.    Plaintiff's First Amendment Claim

As stated by the Supreme Court in *Garcetti*, "[i]t is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" 126 S.Ct. at 1955, quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983). However, *Garcetti* established that "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 1960. Thus, *Garcetti* holds that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

In *Garcetti*, the parties did not dispute that the employee's statements were made pursuant to his official duties, and thus the Supreme Court stated it had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 1961. The only comment the Supreme Court made in this regard is that it rejects the suggestion that "employers can restrict employees' rights by creating excessively

5

broad job descriptions." *Id.* And, the Court also noted that "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 1962.

In the subsequent Tenth Circuit decision in *Casey v. West Las Vegas Indep. School District*, 473 F.3d 1323 (10th Cir. 2007), the Court noted that "[b]esides encouraging lower courts to view the facts from a 'practical' perspective," the Supreme Court's decision in *Garcetti* "declined to provide guidance on how we are to go about determining the appropriate scope of an employee's official duties: . . . ." 473 F.3d at 1328, n. 5. *See* similar comment in *Green v. Bd. of County Comm'rs*, 472 F.3d 794, 798 (10th Cir. 2007). Nonetheless, *Casey* proceeded to separately examine whether the plaintiff met her burden to show that each of the statements made by her "were made in her capacity as a citizen and not pursuant to her 'official duties.'" *Id.* at 1328. Accordingly, I will evaluate each of plaintiff's expressions claimed to be protected by the First Amendment to ascertain whether plaintiff has met her burden. Although, as noted above, plaintiff's complaint contains multiple paragraphs relating to the expressions she claims to be protected by the First Amendment, her Supplemental Response conveniently enumerates the seven situations she claims to be at issue in this case.

### 1.    *Plaintiff's participation in the "Barriers and Hurdles Committee"*

Plaintiff first assets that her participation in the City's "Barriers and Hurdles

6

Committee," a committee which met monthly with the Defendant Kramer, the City Manager, to discuss gender discrimination issues within the City, and which apparently issued two or more reports critical of the gender climate in the City government, was "voluntary" and therefore not part of her official duties (Supplemental Response at 7-8). Defendants respond that they do not disagree that her participation was voluntary (Defendants' Reply at 6), but contend that her participation does not amount to expressive conduct protected by the First Amendment (*id*).

To be sure, Defendant Kramer testified that he encouraged women in the City's management to participate in the Committee, and agreed that participation was "voluntary" and not part of their job (Kramer Depo., Exhibit 8 to Supplemental Response at 20). But, there is no indication that plaintiff was participating in the Committee as a private citizen. She was on the Committee only because she occupied a management position within the City government. Moreover, it appears that the written reports of the Committee were issued internally to the City Manager only, and not to the public or outside the City government (*see* Exhibit 10 to Supplemental Response). There is no indication here that plaintiff individually went outside established institutional channels in order to express a complaint or concern. *See e.g. Weintraub v. Bd. of Educ. of City of New York*, 2007 WL 1549138 at * 6 (E.D.N.Y., May 29. 2007). *See also Casey, supra*, 473 F.3d at 1332-33 (the school superintendent's statements to the school board were found not subject to First Amendment protection, but her complaints to the State Attorney General were found to be protected speech); *Overton v. Bd. of County Comm'rs of Rio Blanco County*, 2006 WL 2844264 at * 2 (D.

Colo., Sep. 29, 2006) (the employee's statement to a state laboratory inspector about suspected billing impropriety was found arguably outside the employee's official duties).  I recognize that *Garcetti* states that "in some cases" employees have protection for statements made at their workplace, and the fact that the plaintiff there "expressed his views inside his office, rather than publicly" was "not dispositive."  126 S.Ct. at 1959.  Nonetheless, as noted above, courts have looked, in part, to the recipients of the employee's expressions for purposes of evaluating whether the statements are made in the scope of the employee's duties.

In addition, as defendants argue, the report of the Committee was issued in its name, not in the name of any Committee member, and the report does not contain individualized expressions attributable to any particular member of the Committee. So, even if the plaintiff were acting as a private citizen in serving on the Committee, I find no example of her individualized expression on a matter of public concern that would be entitled to First Amendment protection.

This situation parallels that in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), a case cited favorably by the Tenth Circuit in *Green, supra,* 472 F.3d at 198.  In *Freitag*, the terminated prison guard argued that several aspects of her expressive conduct were protected by the First Amendment.  While the Ninth Circuit agreed that some of the plaintiff's conduct included matters expressed as a private citizen and were protected by the First Amendment, the filing of internal complaints of a sexually hostile work environment and sexual harassment were found not to be expressions of a private citizen but rather within her official duties as a correctional officer.  468 F.3d at 546.

8

*See also Carrero v. Robinson*, 2007 WL 1655350 at *4 (D. Colo., June 5, 2007) (internal complaints by prison guard, regarding racial segregation of inmates, are within scope of his job duties and not protected speech for purposes of First Amendment retaliation charge).

Here, although plaintiff's written job description may not have required service on the Barriers and Hurdles Committee, or her participation in efforts to ferret out gender discrimination in the City departments, I cannot conclude that plaintiff has met her burden to show that her actions in this regard were taken as a private citizen outside the official duties of her position.

### 2.    *Plaintiff's activities relating to sale of Lot 5*

Plaintiff argues that concerns she expressed regarding the sale of Lot 5, a city-owned parcel of land that was being considered for sale to the City's Urban Renewal Authority at what she claims was $1 million below market value, were expressed "as a concerned citizen and taxpayer" and not as part of her official duties (Supplemental Response at 8-9). Plaintiff identifies her expressions of concern to include the fact that the appraisal used in connection with the sale was outdated and based on incomplete information, that the City Council had not "waived formal disposal procedures," and that the Council did not know that the Authority planned to transfer the property to a private developer (*id*). Plaintiff asserts that she expressed these concerns to Jim Rees, the City Urban Redevelopment Manager (plaintiff's "customer"), her supervisor, Ron Cousar, Director of Internal Services, Defendant Nickerson, the Deputy City Manager, Defendant Kramer, the City Manager, Mary Collins, Assistant City Manger, and the City

Attorney (*id.* at 9, and Exhibit 11 to Supplemental Response). Plaintiff contends that since her job duties required only that she provide "advice" she was not required to "supervise" this transaction, nor was she "required to ensure that the customer complied with her advice," so that any effort she made to report her concerns were outside the scope of her duties (*id.* at 9-10).

Although plaintiff's job description may not have specified that she was to "supervise" real estate transactions, it does provide that she was to manage a department that "delivers real property services for City projects and programs, including real estate acquisition, . . . sale of surplus properties . . . and protection of real property assets." (*See* Exhibit A to Defendants' Motion.) Whether or not the job description is determinative of plaintiff's official duties for purposes of First Amendment evaluation, this job description clearly contemplates the Real Estate Division providing the kinds of advice plaintiff claims to have provided. Efforts to ensure compliance with applicable rules by a department one advises or supervises are generally viewed as within the person's official duties. *See Casey, supra*, 473 F.3d at 1330-31. In addition, the written communications issued by plaintiff are issued over her title as "Real Estate Services Manager," and not in her own name as a private citizen (*see* Exhibits 11 and13 to Supplemental Response; Exhibits C and D to Defendants' Reply Brief). Accordingly, I cannot conclude that plaintiff has met her burden to show that these expressions of concern were voiced as a private citizen rather than in conjunction with her position as the manager of the City's Real Estate Services Division.

### 3.     Plaintiff's comments regarding the Cumbre Vista Project

In Fall 2005, the Real Estate Services Division received a development plat for the Cumbre Vista project, which designated certain tracts for dedication to the City for park or open space usage.  Plaintiff expressed concerns that a Phase II environmental assessment should be performed on the site because of concerns of high levels of toxic material in the soils (Supplemental Response at 10-11).  Plaintiff's suggestion was apparently rejected by the Deputy City Manager, Defendant Nickerson, who wrote in an e-mail dated November 1, 2005, that "the City will not be requiring the 'Phase 2' environmental study that was recently recommended by the Real Estate Office." (Exhibit 15 to Supplemental Response).

A follow-up e-mail dated November 18, 2005 suggests that as real estate manger plaintiff may have authority to request an environmental audit and requested plaintiff to attend an upcoming meeting of the Land Use Committee "to communicate her current practice/policy on . . . requiring environmental audits."  (Exhibit 20 to Supplemental Response).  In response, plaintiff wrote to her supervisor, Ron Cousar, that she would view such a meeting as "a learning opportunity" and that she was "not here to hold things up" and was "not being difficult or uncooperative and am looking forward to this discussion to assist everyone in resolving these issues."  (*Id.*)

Plaintiff contends that her opinion that a Phase II environmental assessment should be performed was expressed as "a concerned private citizen and grandmother who would not want her grandchildren playing in a park which might contain contaminants." (Affidavit of Clark-Wine, Exhibit 3 to Supplemental Response, ¶ 12).

I disagree. The memoranda regarding this matter were exchanged through the City's e-mail system, and in every respect address the plaintiff in her capacity as manager of the City's Real Estate Services Division. Her own expressions do not indicate in any way that she is speaking as a private citizen, or as a grandmother, and there is no indication that she expressed her views outside internal City channels. Again, as stated above, efforts to ensure compliance with applicable City rules are generally viewed as within the person's official duties.

### 4. *Plaintiff's involvement in the proposed sale of surplus property*

According to plaintiff, in December 2004 she was informed by the Colorado Springs Utilities representative that the Broadmoor Hotel was interested in purchasing surplus City property adjacent to the hotel (Affidavit of Clark-Wine, Exhibit 3 to Supplemental Response, ¶ 13). Plaintiff attests that she advised the representative that the City Council could waive procedures requiring the parcel be sold to the highest bidder, and a direct sale to the Broadmoor at the fair market value could be arranged (*id.*). When the property was appraised at $730,000, the Broadmoor indicated that it was no longer interested at that price, and the property was offered to a third party willing to pay $850,000 (*id.*). According to plaintiff, the Broadmoor opposed the sale to the third party as the property's location between two holes on the Broadmoor golf course presented access issues. The City rejected the third party's offer (*id.*).

Plaintiff asserts that she published oral and written statements supporting the sale to the third party as the City Council had not waived the bidding requirements and the property should have been sold at fair market value (*id.*). In a memorandum dated

July 14, 2005, addressed to the CEO of the utilities department, with copies to the City Manager and Deputy City Manager, plaintiff recounted that "[o]n May 31, 2005, in accordance with surplus property disposal procedures, Real Estate Services conducted a sealed bid auction . . . " (Exhibit 16 to Supplemental Response at 1). The memorandum reports that the Broadmoor had expressed concerns about access if the sale was completed, that the bidder was informed about the potential access problem, but wanted to proceed with the transaction nonetheless (*id.* at 2-3). The memorandum concludes with plaintiff's "recommendation that the bidder be permitted to proceed with his due diligence." (*Id.* at 3).

Plaintiff now claims that her job duties did not include ensuring that the utilities department transaction be reviewed by the Deputy City Manager or City Manager, and that she "spoke out on the perceived preferential treatment given to the Broadmoor as a concerned private citizen and taxpayer." (Affidavit of Clark-Wine, Exhibit 3 to Supplemental Response, at ¶ 14).

However, once again, I cannot conclude that plaintiff has demonstrated that her expressions of concern were made in her capacity as a private citizen outside the scope of her job duties. Her written communication about the surplus property transaction, the only expression plaintiff presented to the Court on this issue, is printed on the letterhead of the City of Colorado Springs, is captioned "interoffice memorandum," and states that it is from "Betty Clark-Wine, Real Estate Services Manager." (Exhibit 16 to Supplemental Response at 1). Copies of the memorandum were apparently sent to several city officials, including Defendants Kramer and

Nickerson, as well as the City Attorney (*id.* at 3).  Yet, there is no indication or evidence

that the plaintiff's concerns were expressed outside institutional channels, to a

newspaper, or anywhere in the marketplace of public opinion.  Every facet of the

memorandum reflects that it is an expression of the position of the Real Estate Services

Division and no element of the memorandum gives the appearance of a private

expression of opinion.  I cannot conclude that this expression was made outside

plaintiff's job duties or as a matter of protected First Amendment speech in light of

*Garcetti* and *Casey*.

### 5.    *Plaintiff's involvement in the transfer of the City Cemetery*

Plaintiff asserts that in the summer of 2005, the Real Estate Services Division

was asked to provide advice with respect to the sale of real property by the City's

Cemetery to the City's Transit Services Department ("TSD") (Supplemental Response

at 12-13).  Plaintiff argues that the Transit Department had agreed to pay $500,000

for the property to be used as a transit facility, and that TSD anticipated the purchase

would qualify for either federal funding or funding from the Pikes Peak Rural

Transportation Authority ("PPRTA") (*id.* at 13).  However, according to plaintiff,

upon an appraisal of the property in July of 2005, it became apparent to her that the

$500,000 purchase price was not justified, in part because of the potential clean-up

costs required to make the property suitable for use as a transit facility (*id.*).  Plaintiff

states that she expressed her concern to the TSD and to her supervisor that she was

being "pressured to justify an artificially high price" and that the transaction may have

the appearance of impropriety and misuse of taxpayers' funds if one City entity buys

another entity's contaminated property for a price exceeding the fair market value, particularly when using federal or PPRTA funding (*id.*).

In response to plaintiff's objections, the TSD sent a memorandum dated July 19, 2005 to plaintiff's supervisor to discuss "issues that have arisen over the past year regarding services provided by Real Estate Services (RES) to the Transit Services Division. . . ." and "to suggest areas in which RES could improve customer services" (Exhibit B-2 to Defendants' Motion at 1). In a follow-up memorandum the TSD director advised plaintiff's supervisor that in connection with the above transaction the RES retained an appraiser without our [TSD] approval who had no experience in appraising contaminated landfills (Exhibit B-1 to Defendants' Motion at 1).

Plaintiff contends that her job duties did not include "gaining customers' compliance with her advice," or commenting on the appropriate use of municipal, PPRTA or federal funds (Supplemental Response at 14). She states that she "spoke out against the Cemetery transaction as a concerned private citizen and taxpayer." *Id.*

The limited record regarding this transaction does not support plaintiff's position. She plainly became involved in this transaction through her official position when she arranged for the appraisal. She used her official position to challenge the propriety of the transaction, complaining to her supervisor and the director of the TSD. She was perceived by the TSD as acting in her official capacity. She provides no evidence that she expressed concerns outside the City channels. Again, I disagree that this expression was made outside her job duties or as a matter of protected First Amendment speech in light of *Garcetti*.

15

### 6.     Plaintiff's request for an audit of the RES division

Plaintiff states that in August and September of 2005, she requested the City deputy auditor and City auditor to conduct audits of RES because "real estate transactions are taking place all over the City and there is little control or check off" and because she felt her office was "subject to undue influence because of the chain of command."  (Supplemental Response at 14).  Apparently, an audit was initiated although no results are reported by plaintiff (*id.*).  Plaintiff asserts that requesting audits was not part of her job responsibilities and therefore she should have First Amendment protection (*id.* at 15).

Yet again, I cannot conclude that plaintiff has met her burden to show that such activity is outside her job responsibilities or subject to First Amendment protection. As the manager of RES, plaintiff is inherently responsible for managing its activities and operations, and alerting City officials to any perceived noncompliance as part of those responsibilities.  As the Tenth Circuit stated in *Casey*, an employee's advising superiors of the lawful and proper way to conduct business in the face of potential noncompliance is within an employee's regular duties.  *Casey, supra*, 473 F.3d at 1329.

### 7.     Plaintiff's interoffice memorandum to the City's employee relations manager

On December 11, 2005, plaintiff sent an "interoffice memorandum" to Latrelle Easterling, the City's employment relations manager, bearing the subject line: "Progress Report with respect to meeting with Dave Nickerson and Ron Cousar

16

11/2/05." (Exhibit 12 to Supplemental Response). The memorandum to Easterling refers not only to the referenced meeting, but also to a memo sent by Cousar to plaintiff dated November 7, 2005 (Exhibit C to Defendants' Motion) and plaintiff's response to that memo sent by her on November 15, 2005 (Exhibit D to Defendants' Motion). The exchange of memos relate to job performance issues raised by Cousar and plaintiff's response to those issues. The memorandum from plaintiff to Easterling summarizes plaintiff's positions on numerous matters and defends her conduct in some of the above-mentioned matters, concluding that "I consider myself a problem-solver and my intentions are not to thwart projects or plans. Unfortunately my predecessor was so 'loose' that any regulation appears to be extreme." (Exhibit 12 to Supplemental Response at 4).

Plaintiff characterizes this communication as a memorandum informing Easterling "that the City had prohibited her from speaking out on issues of govern-mental waste, mismanagement and abuse; and had retaliated against her when she tried to point out" such issues (Supplemental Response at 15). Plaintiff argues that the memorandum constitutes speech protected by the First Amendment because her job duties did not require her to comment on the City's employment practices (*id*).

A careful review of plaintiff's communication with Ms. Easterling reflects that the main thrust of the memorandum is to address plaintiff's own personnel issues in her position as manager of the Real Estate Services Division. As the Tenth Circuit has long held, matters of internal personnel concerns are not matters subject to First Amendment protections. *See e.g. Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir.

17

1996) ("speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern.") (Citation omitted).

Moreover, here it does not appear that plaintiff was speaking as a private citizen or was acting outside her job duties when she sent the memorandum to Easterling. The memorandum is sent on City stationery, it is titled "interoffice memorandum" and it is signed by plaintiff over her job title. As with her other communications, there is no indication that plaintiff published the statements in the memorandum outside the City channels. In sum, plaintiff has failed to show that this communication was made by her as a private citizen, or outside the scope of her position, or that it is protected by the First Amendment.

For the reasons set forth above, I cannot conclude that plaintiff has shown a right to First Amendment protection for any of the seven expressions for which she claims such protection. Accordingly, defendants are entitled to summary judgment as to plaintiff's claim of violation of her First Amendment rights and, in turn, her third claim for declaratory relief.

Although the First Amendment does not apply when a plaintiff speaks out in her official capacity, as the Supreme Court noted in *Garcetti*, exposing governmental inefficiency and misconduct are matters of considerable significance, and public employers should be receptive to constructive employee criticism. 126 S.Ct. at 962. Thus the Supreme Court emphasized the availability of whistleblower protection under federal and state statutes for those who seek to expose governmental wrongdoing. *Id.* With this admonition in mind, I turn to plaintiff's whistleblower claim under state statute.

**B.    Plaintiff's Claim Under Colorado's State Employee Protection Act**

The legislative declaration to the State Employee Protection Act, C.R.S. § 24-50.5-101 provides: "the general assembly declares that state employees should be encouraged to disclose information on actions of state agencies that are not in the public interest and that legislation is needed to ensure that any employee making such disclosures shall not be subject to disciplinary measures or harassment by any public official."  To enforce this declaration, the statute further provides: "Except as provided in subsection (2) of this section, no appointing authority or supervisor shall initiate or administer any disciplinary action against an employee on account of the employee's disclosure of information."   C.R.S. § 24-50.5-103(1).  The statute defines "employee" as any person employed by a state agency.  C.R.S. § 24-50.5-102(3).  State agency is defined as "any board, commission, department, division, section, or other agency of the executive, legislative, or judicial branch of state government."  C.R.S. § 24-50.5-102(4).

As noted, defendants assert that plaintiff is not entitled to the protections of this act as she was not a "state" employee, but rather an employee of the City of Colorado Springs.  Plaintiff, apparently recognizing that the plain language of the statute would not apply to a city employee, and acknowledging that no court has so interpreted the whistleblower statute, nonetheless argues that the statute should be "read broadly" to include protection of "government employees of a state-chartered, municipal corporation."  Plaintiff's Response (Dkt. # 32) at 2.   Although citing no Colorado authority, she contends that a home rule city such as Colorado Springs, which is

19

created pursuant to Article XX, Section 6 of the Colorado Constitution, "is necessarily an agency or subdivision" of the State under the whistleblower statute (*id.* at 3). I disagree.

First, the plain terms of the whistleblower statute apply only to state employees. If the Colorado General Assembly had intended the statute to cover employees of other governmental entities, it could easily have so provided. Indeed, the City may pass its own whistleblower ordinance protecting its employees.

Second, while it is not disputed that Colorado Springs is a home-rule city incorporated under Article XX, Section 6 of the Colorado Constitution, I do not read that section as providing that home rule cities created thereunder are agencies or subdivisions of the State government. In fact, the section expressly provides that the charters and ordinances of such home rule cities "shall supercede," within the city's territorial limits, any state law in conflict with the charter or ordinances. In addition, the section provides that the state laws shall continue to apply to such cities, unless they are superseded by the charters or ordinances of such cities. Colo. CONST. Art. XX, § 6. These provisions have been interpreted to mean that "[a]lthough the legislature continues to exercise authority over matters of statewide concern, a home rule city pursuant to Article XX is not necessarily inferior to the General Assembly with respect to local and municipal matters." *Fraternal Order of Police, Colo. Lodge No. 27 v. City and County of Denver*, 926 P.2d 582, 587 (Colo. 1996). Since the home rule city has the ultimate authority in matters of local concern, it is not a mere agency of the state.

Moreover, under Article XX, Section 6 of the Colorado Constitution, home rule cities have "supplemental authority" to regulate on a subject matter of both local and statewide concern. *DeLong v. City and County of Denver,* 195 Colo. 27, 32, 576 P.2d 537, 540 (Colo. 1978). When there is no conflict between the state statute and the charter provision, the latter controls. 576 P.2d at 540.

Here, the record shows that the City indeed exercised its supplemental authority to offer whistleblower protection to its own municipal employees in language similar to that provided by state law. Article 4 of the Colorado Springs Municipal Code sets forth regulations pertaining to City employees. In language quite similar to the state whistleblower statute, Section 1-4-107 of the article, entitled "Retaliation Against Employees Prohibited," provides that: ". . . no appointing authority or supervisor shall initiate or administer any disciplinary action, deny a promotional opportunity, write an adverse job performance evaluation or in any way adversely affect an employee on account of the employee's disclosure of information." Exhibit F to Defendants' Reply Brief at 1-2.

Pursuant to the Colorado Springs municipal ordinance, City employees such as plaintiff are protected from retaliation for expressing their views on government inneffciency or misconduct because the ordinance prohibits City employers from administering "any disciplinary action . . . on account of the employee's disclosure of information." *Id.* Thus, even if the state law did apply to City employees, the City of Colorado Springs has supplanted the state law with its ordinance which does not conflict with the state law. The ordinance therefore controls.

21

Although the state whistleblower statute is inapplicable to her, plaintiff in this case is not left without protection, as she could bring a claim under the municipal ordinance. Thus, the public policy promoted by the Court in *Garcetti* is not jeopardized here, because the City provides adequate protection for municipal employees who expose wrongdoing. But inexplicably, plaintiff has neither brought a claim under this ordinance, nor does she make mention of it in her complaint or in her responses to defendants' motion. The date for seeking to amend the pleadings, September 21, 2006 (*see* Dkt. # 18) has long passed and a Final Pretrial Order has been entered. Plaintiff's claim under the state whistleblower statute must be dismissed with prejudice as the statute does not apply to her.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment (Dkt. # 25) is GRANTED. The Clerk of the Court is directed to enter judgment for the defendants, with costs awarded to defendants.

DATED:  January 17, 2008.

BY THE COURT:

s/Lewis T. Babcock
Lewis T. Babcock
United States District Judge